[Cite as *In re A.C.*, 2018-Ohio-384.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 105336**

# IN RE: A.C., ET AL.
# Minor Children

[Appeal by P.B., Father]

## JUDGMENT:
AFFIRMED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD 13908673, AD 13908674, and AD 13908675

**BEFORE:** Blackmon, J., E.A. Gallagher, A.J., and Jones, J.

**RELEASED AND JOURNALIZED:** February 1, 2018

**ATTORNEY FOR APPELLANT**

Jeffrey Froude
P.O. Box 7711122
Lakewood, Ohio 44107


**ATTORNEYS FOR APPELLEE**

**C.C.D.C.F.S.**

Michael C. O'Malley
Cuyahoga County Prosecutor

By: Anthony R. Beery
Cheryl Rice
Assistant County Prosecutors
4261 Fulton Parkway
Cleveland, Ohio 44144

**Also Listed**

**Attorney for Child**

John M. Stryker
Stryker Law Co., Ltd.
20006 Detroit Road, Suite 310
Rocky River, Ohio 44116

**L. C. (Mother)**

Jonathan N. Garver
The Brownhoist Building
4403 St. Clair Avenue
Cleveland, Ohio 44103

Michael S. Weiss
602 Rockefeller Building
614 W. Superior Avenue
Cleveland, Ohio 44113

**Guardians Ad Litem**

Carla L. Golubovic
P.O. Box 229127
Parma, Ohio 44129

Gail A. Nanowsky
P. O. Box 26060
Fairview Park, Ohio 44126

**T.H. (Maternal Grandmother)**

Theodore Amata
12107 Mayfield Road, Suite 202
Cleveland, Ohio 44106

PATRICIA ANN BLACKMON, J.:

{¶1} P.B. ("Father") appeals the juvenile court's decision terminating his parental rights and awarding permanent custody of his children B.B., C.C., and A.C. to the Cuyahoga County Department of Children and Family Services ("CCDCFS"). Father assigns the following error for our review:

> I. The trial court erred in granting permanent custody of the minor children to Cuyahoga Division of Children and Family Services because clear convincing evidence was not presented excluding Father from reunification with his children in any of the factors of O.R.C. § 2151.414(E) or (D).

{¶2} Having reviewed the record and pertinent law, we affirm the decision of the trial court. The apposite facts follow.

{¶3} On June 14, 2013, CCDCFS filed a complaint requesting permanent custody of B.B., whose date of birth is March 10, 2008; C.C., whose date of birth is July 7, 2009; and A.C., whose date of birth is May 22, 2011. The children were in the legal custody of a maternal relative at the time, after having been previously adjudicated dependent.[1] The complaint in the case at hand alleged that all three children were dependent and that A.C. was abused. Specifically, the complaint alleged that the maternal relative was no longer willing to care for the children because of the children's mother's ("Mother") and maternal grandmother's interference. The complaint further alleged that the children had returned from visiting maternal grandmother with "unexplained bruising, lice, and bed

---

[1] *See In re: A.C.,* Cuyahoga C.P. Nos. AD11907234, AD1190735, and AD11910860.

bug bites." Additionally, A.C. refused to eat after visiting with maternal grandmother and was diagnosed with "non-organic failure to thrive."

{¶4} The complaint also alleged that Mother and Father suffer from mental illness, which "interferes with [their] ability to provide safe and adequate care of [their] children," Father "lacks a stable environment to provide for the basic needs of his children," and "Father is currently involved in a domestically violent relationship."

{¶5} The court held a hearing on August 2, 2013, and granted pre-adjudicatory temporary custody to CCDCFS. On January 21, 2014, the court found "that the allegations of the complaint have been proven by clear and convincing evidence" and adjudicated the children dependent.

{¶6} On September 15, 2014, Father stipulated to the disposition of permanent custody to CCDCFS. After several hearings, the court terminated Mother's parental rights and committed the children to the permanent custody of CCDCFS.

{¶7} Father appealed, and this court reversed, finding that the juvenile court failed to comply with Juv.R. 29(D) when accepting Father's stipulation and holding that his "admission to the complaint cannot be considered knowingly and voluntarily entered * * *." *In re: A.C.,* 8th Dist. Cuyahoga No. 102351, 2015-Ohio-3673, ¶ 6.

{¶8} The case was remanded to the juvenile court and, on January 25, 2016, CCDCFS filed an amended case plan, which changed CCDCFS's custody status from permanent to temporary and reinstated services for Father. The court held a hearing on March 30, 2016, and on April 6, 2016, adjudicated the children dependent. As to Father,

the court noted that he is consistent with visiting the children. However, the court referred him to the "Diagnostic Clinic for a[n] updated psychological evaluation" and ordered him to "attend all appointments." The court again held several dispositional hearings in October 2016 and on December 5, 2016, issued a journal entry committing the children to the permanent custody of CCDCFS. It is from this order that Father appeals.[2]

**{¶9}** After the present appeal was instituted, we remanded the case to the trial court for compliance with this court's decision in *In re: R.G.*, 8th Dist. Cuyahoga No. 104434, 2016-Ohio-7897 (holding that a trial court has a duty under the Indian Child Welfare Act to direct an inquiry to the participating putative parents concerning potential Native American ancestry). *See also* Bureau of Indian Affairs, *Guidelines for Implementing the Indian Child Welfare Act* (Dec. 2016), https://perma.cc/3TCH-8HQM (stating that state courts must ask each participant in an emergency or voluntary or involuntary child custody proceeding whether the participant knows or has reason to know that the child is an Indian child); 81 Fed.Reg. 96476. The trial court complied with our limited remand and issued a journal entry finding that no Native American ancestry has been established.

## Standard of Review

**{¶10}** We review the court's granting permanent custody to CCDCFS under the following standard:

> R.C. 2151.414 establishes a two-part test for courts to apply when determining a motion for permanent custody to a public services agency.

---

[2]Mother is also appealing the termination of her parental rights concerning B.B., C.C., and A.C. *See In re: A.C.,* 8th Dist. Cuyahoga No. 105347.

The statute requires the court to find, by clear and convincing evidence, that (1) granting permanent custody of the child to the agency is in the best interest of the child under R.C. 2151.414(D), and (2) either the child (a) cannot be placed with either parent within a reasonable period of time or should not be placed with either parent if any one of the factors in R.C. 2151.414(E) are present; (b) is abandoned; (c) is orphaned and no relatives are able to take permanent custody of the child; or (d) has been in the temporary custody of one or more public or private children services agencies for twelve or more months of a consecutive 22-month period. R.C. 2151.414(B).

*In re J.M-R.*, 8th Dist. Cuyahoga No. 98902, 2013-Ohio-1560, ¶ 26.

## **Custody Hearing Testimony**

Mental Health Professional

{¶11} On October 24, 2016, Dr. Amy Justice, the clinical psychologist who conducted Father's psychological evaluation through the Cuyahoga County Juvenile Court's Diagnostic Clinic, testified as follows: She saw Father in May 2016, and "completed the report after looking at the collateral information in early July of this year." In 2013, Father took an IQ test and "scored in the range of intellectual deficiency mild," with a full scale score of 65. Dr. Justice explained this score as being at "the tail end, if you're looking at, for example, a bell curve, and it would be the tail end where about 2 percent of people score. * * * On the lower end." According to Dr. Justice, Father's "[l]anguage use reflected concrete content likely in relation to limited cognition." The doctor further explained that "sometimes it's harder for people who have concrete ways of thinking to understand more abstract or higher order thinking."

{¶12} Dr. Justice testified that, despite Father's "extensive history of mental illness requiring numerous psychiatric hospitalizations, * * * [c]urrently [Father] denied virtually

all and any symptoms of major mental illness." This raised a concern regarding parenting because "it might relate to willingness to obtain treatment. If you can't recognize that you have a problem, then you're less likely to pursue treatment for it."

{¶13} Dr. Justice recommended that Father "participate in psychiatric consultation to investigate any potential benefit to him from pharmacotherapy [and] counseling services to help him address problems in living as they arise and so forth." Dr. Justice noted that, previously, Father "dropped out of treatment without following up and completing it * * *."

{¶14} On cross-examination, Dr. Justice testified regarding the parenting skills of someone "on the low end of the bell curve" intellectually: "There are some people who can parent well within that category, and then other people who cannot." Dr. Justice further testified that she did not assess whether Father "was a fit or unfit parent."

Foster Father

{¶15} At the October 25, 2016 hearing, Arthur M. Falls testified that he and his wife have been the children's foster parents for approximately five years.[3] When the

---

[3] The Falls family first fostered the children in 2011 for approximately nine months. The children then lived with a maternal relative for a little over a year. The children returned to the Falls residence in the summer of 2013 in conjunction with the case at hand. Falls and his wife are also the foster parents of J.S., whose Mother gave birth to in September 2014, during the pendency of this case. Falls and his wife have fostered J.S. since he was a day and a half old. J.S. has a different biological father than A.C., B.B., and C.C. All four children continue to reside with the Falls family.

We note that Mother and J.S.'s father are appealing the termination of their parental rights concerning J.S. *See In re: A.C.,* 8th Dist. Cuyahoga No. 105347; *In re: J.S., III,* 8th Dist. Cuyahoga No. 105344.

children first came to the Falls home, B.B. "was having seizures," and C.C. and B.B. "had head lice * * *." C.C.'s lice "was so bad that she had scabs on her head from them." A.C. "was undernourished and underweight." Prior to CCDCFS's involvement in this case, A.C. had been hospitalized twice: first, for two weeks after falling; and second, for one week for "malnutrition and dehydration." Falls testified that the children are "doing better" now, although B.B. "still has issues. She's delayed. She's a work-in-progress. She's getting there."

{¶16} Falls testified that the children visit Father and Mother every other Wednesday. Falls drives them from their home in Canton to Cleveland after school for a two-hour visit. The travel time is one hour and 15 minutes each way. Falls testified that Father has been "very consistent" with visitations and usually brings the children a snack or something to drink. Falls does not stay to "watch the interaction with the children"; rather, he drops them off and picks them up.

Social Workers

{¶17} Venita Wiggins, who was the CCDCFS case worker for the children through December 2014, testified that, in her opinion, "it's in the best interest of the children to remain where they are. I believe they've been there for the greater part of their lives in the foster system with the foster parents. So I think in my opinion that they are where they need to be."

{¶18} Mi-Lin Tate, who is the current CCDCFS case worker for the children, testified that Father's case plan services include basic needs and mental health.

Specifically, Father's issues are "[h]ousing, being able to maintain housing, utilities, working utilities, food in the home, beds in the home for the children." Tate testified that Father lived with his sister, her husband, and their three children. Father stayed in the attic, and Tate's opinion was that "[t]here's not enough room for three more children in that home." Tate and Father discussed his living arrangements, and Father "always informed [Tate] that he was moving out and getting his own place." However, at the time of the hearing, Tate had no evidence or knowledge that Father did so.

{¶19} As to Father's mental health services, Tate did not make any referrals "due to his choice of wanting to go to Murtis Taylor where he had already been going." Tate testified that there was no need for referrals because Father was already using mental health services. However, when Tate contacted a representative at Murtis Taylor, she learned that Father had an updated assessment, but he "did not follow up" with his services after that. Tate further testified that Father did not provide her any information regarding the status of his mental health services.

{¶20} Asked if she was aware that Murtis Taylor would not accept Father's insurance, Tate testified, "that's not information I was given." Tate testified that if she was aware that insurance was an issue, CCDCFS policy would have been to make a referral for mental health services.

{¶21} Tate testified that Father's visits with the children "go well." "He does bring snacks for the kids. He tries. He brings a juice box and a bag of chips or a bag of cookies generally for them to eat. And he interacts with the children. He plays music,

colors." Tate has discussed with Father that visitation occurs near dinner time, and the children need more to eat. Tate suggested "sandwiches at least," for the purpose of showing CCDCFS that he "can provide food for the children, and * * * show that [he is] trying and [he has] the ability to feed the children during those two hours." Despite Tate's suggestion, there is no evidence in the record that Father brought anything other than snacks and drinks to the visits.

{¶22} Tate was also concerned about Father receiving assistance with bus tickets to and from his visits with the children. "The concern basically is * * * that he can actually do it on his own, to show that he has the means to do it on his own, such as even taking care of the children and providing transportation for the children when necessary without using assistance such as the Collab,[4] because the Collab won't be there all the time."

Father

{¶23} Father testified that, approximately one week prior to the hearing, he moved into the downstairs unit of a duplex. According to Father, he rented this place by himself for $450 per month, and it has four bedrooms. Father further testified that he did not inform Tate or anyone else that he relocated; in fact, he spoke with Tate the week before the hearing and told her he was still living with his sister. Father testified that he receives $783 per month in disability, and that after paying rent, he would have about $200 left each month, but that he "could stretch it out" to provide for his three children.

---

[4]It does not appear that "Collab" is explained or defined anywhere in the record of this case.

Additionally, he receives "food stamps" and believes he could get social security payments for his children.

**{¶24}** Father testified that he was not currently receiving mental health services, because Murtis Taylor never called him back. Additionally, Father acknowledged that he had his parental rights terminated as to two other children.

Guardian Ad Litem

**{¶25}** The children's guardian ad litem ("the GAL") filed a report dated July 27, 2016, recommending that the children should be placed in the permanent custody of CCDCFS. Specifically as to Father, the GAL reported as follows: Father has mental health issues that interfere with his "ability to provide safe and adequate care of their children." Father's home environment is not "appropriate or adequate to meet the basic needs of the children." Father stated to the GAL that he intended to secure suitable housing; however, the GAL was "unaware of any alternative housing for the Father, to date." Additionally, Father "failed to complete Case Plan services/objectives." The GAL noted that "[t]he children have been out of the care and control of the Mother and the Father for *nearly* five years." (Emphasis sic.)

**{¶26}** The GAL testified that permanent custody to CCDCFS was in the children's best interest:

> [B]ecause of the length of time that they've been out of their parents' care and control. The children have been removed for five years. It's in their best interest because they have a very strong bond of attachment to their foster family. They have a foster mother, foster father that are able to meet all of their basic needs, all of the specialized needs of the children.

It is my opinion that not any of the parents and not the maternal grandmother are able to provide for the children appropriately.

And the children have a strong bond of attachment with one another and they are entitled to a stable home. They're entitled to a life where their needs are going to be met and where they are a priority, and I believe they have that.

**{¶27}** The GAL further testified that the foster family has "a lovely home."

It's child-centered. The girls have a bedroom together. The boys have a bedroom together. The backyard is huge. * * * They have a lot of activities. There's a lot of toys.

The children are very happy. There are five dogs in the home but they're very small, tiny dogs * * *. The children interact with the dogs appropriately. They don't present any risk. The home is very clean.

[The foster father], when he wasn't working, was a stay-at-home father and spent his day with [J.S.] and made sure the children were on the bus, took [A.C.] to his pre-kindergarten class, to church, and back again.

They were meeting every need of the children, and the children were very bonded to them, very comfortable in the home. They were comfortable with one another.

**{¶28}** The GAL explained that the foster family works with B.B. "100 percent" to help her overcome her academic delays.

**{¶29}** The GAL testified that she had not visited Father's new residence, but she had observed several of Father's visitations with his children. Father "was happy to be there with the children, * * * he was engaged with the children, he tried to entertain them. He was appropriate." The GAL further testified as follows concerning Father:

[I]t was very apparent to me over the past year that [Father] has great affection for his children, and he is very excited to see them and be in their presence, and he's very desirous of having a relationship.

I don't think affection is enough. I don't believe [Father] has the capacity to parent [his] children, not appropriately. It seems he's struggling on his own.

By his own testimony, it took him five years to find a place to live. The home that he was living in with his sister and her family was not suitable, not suitable in any way. And [Father] knew that. [He] told me that it wasn't suitable.

Five years seems an excessive amount of time if you know that your children are in custody to, you know, make attempts and actually provide basic needs and a home structure for them.

### Juvenile Court's Findings

{¶30} On October 27, 2016, the court went on the record[5] and found that it was in the best interest of the children to grant permanent custody to CCDCFS. Specifically, the court found that Father loves the children, although he

cannot sustain suitable housing or appropriate housing, nor can [he] provide [for] the children's basic needs. * * * [Father] has recently moved into a duplex that reportedly has four bedrooms and appropriate furniture, though [CCDCFS] has been unable to verify the new residence. Prior to [Father's] new residence he was residing with his sister [sic] that would not be appropriate for three additional children.

The parents were referred for mental health services, and in this regard

[CCDCFS] certainly failed to provide [Father] with an appropriate referral,

---

[5]The juvenile court noted on the record that this case was on remand from a previous appeal and stated that this court "took * * * approximately nine months" to release our opinion, and "that wasn't even oral arguments heard, briefs weren't written * * *." However, appellate briefs were filed on May 18, 2015, June 9, 2015, July 21, 2015, and August 3, 2015. Additionally, oral arguments were not held because CCDCFS conceded the juvenile court's error. Furthermore, this court issued its opinion on September 10, 2015, which is 38 days after the case was fully briefed. *In re: A.C.,* 8th Dist. Cuyahoga No. 102351, 2015-Ohio-3673.

though [Father] failed to also notify [CCDCFS] that there was an issue concerning his insurance.

{¶31} On December 5, 2016, the court issued a journal entry committing the children to the permanent custody of CCDCFS, and finding, in part, the following:

> Based on the testimony, it is clear that * * * Mother * * * and Father * * * love their children, though [they] cannot sustain suitable or appropriate housing, nor can either provide for the basic needs of the minor child[ren]. * * * Father * * * recently moved into a duplex that reportedly has 4-bedrooms [sic] and appropriate furniture, though the CCDCFS Social Worker was unable to verify the new residence since Father * * * did not apprise the worker of the new address. Prior to the Father's new residence, he was residing with his sister, in a home that would not be appropriate for three (3) additional children. The Parents were referred for Mental Health Services and in this regard, [CCDCFS] certainly failed to provide [Father] an appropriate referral, though [Father] failed to notify CCDCFS that there were issues concerning his insurance.

{¶32} As to whether the children could or should be placed with Father, the court found that R.C. 2151.414(E)(1), (2), (4), and (11) applied to the case at hand. Under subsection (1): "The Parents failed to benefit from Case Plan Services, including Mental Health Services, and Basic Needs. * * * Father failed to engage with Mental Health Services, even though he had an issue with healthcare insurance * * *."

{¶33} Under (2): "The Parents have been diagnosed with chronic mental and emotional illness which prevents the Parents [sic] to provide an adequate home for the minor child[ren] * * *."

{¶34} Under (4): "Although the Parents demonstrated a commitment toward the child[ren] by visiting, they have failed to financially support the minor child[ren]. The

Parents have not had suitable housing, or employment, for several years and therefore cannot meet the basic needs of the minor child[ren] * * *."

**{¶35}** Under (11): "The Father has had Parental Rights involuntarily terminated as to two (2) siblings" of the children.

**{¶36}** Additionally, the court found that various factors under R.C. 2151.414(D)(1) were relevant in determining the best interest of the children. Under subsection (a): The children are bonded with each other "as well as the Foster Parents where the children have resided for approximately four (4) years * * *."

**{¶37}** Under subsection (b): As stated by the GAL, the children wish "to remain with the Foster Family, though the Court has considered the age of the child[ren] * * *."

**{¶38}** Under subsection (c): The children were in foster care from October 2011 through June 2012; they were in the legal custody of a maternal relative from June 2012 through August 2013; and the children returned to the same foster family in August 2013 and have remained there through the pendency of this case.

**{¶39}** Under subsection (d): The children "cannot achieve a secure permanent placement without a grant of Permanent Custody * * *."

**{¶40}** The court also found that the GAL recommended that permanent custody is in the children's best interest, and that CCDCFS "has made reasonable efforts to prevent the removal of the child[ren], to eliminate the continued removal of the child[ren] from [Father's] home, or to make it possible for the child[ren] to return home." Furthermore, the court reiterated that Father failed to complete or benefit from case plan services,

including "basic needs, housing, employment, and mental health * * *," and that he "failed continuously and repeatedly to substantially remedy the conditions causing the child[ren] to be placed outside the child[ren's] home."

### Analysis

{¶41} All witnesses, other than Father, testified consistently that Father's housing situation was not appropriate for the children. Father's testimony that he moved into a more suitable residence is unverified and uncorroborated. As a result of this testimony, the court found that Father failed to obtain suitable housing, which was part of his case plan for more than three years.

{¶42} Furthermore, all witnesses, other than Father, testified consistently that Father suffers from chronic mental illness, which prohibits him from being able to adequately provide for his children's needs. According to the record, Father was not engaged in mental health services or otherwise receiving mental health treatment at the time of the hearing. Father's reasoning was that he was not currently experiencing any symptoms, and his regular counseling service at Murtis Taylor would not accept his insurance. This testimony is uncorroborated and inconsistent with other testimony in the record.

{¶43} Father reported to Dr. Justice that he had never been hospitalized for psychiatric reasons and generally downplayed his mental health issues. However, Father's psychological evaluation report shows a lengthy history of mental health problems and treatment dating back to 1999, including eight psychiatric hospitalizations,

suicidal and homicidal ideations, visual and auditory hallucinations, and substance abuse. Father has been diagnosed with depressive disorder, adjustment disorder, schizoaffective disorder, borderline intellectual functioning, mood disorder, and intermittent explosive disorder. Furthermore, his mental health treatment has been terminated several times "over the years based on his failure to follow treatment protocols, namely not complying with medication regimens, not obtaining requested consultations, and not attending counseling appointments."

{¶44} Father additionally self-reported to Dr. Justice that "he has been convicted of Domestic Violence four times between 2008 and 2013." However, there is nothing in the record to corroborate or verify these convictions.

{¶45} Furthermore, although the juvenile court found that the children have "not been in [CCDCFS] custody for 12 of 22 consecutive months * * *" under R.C. 2151.414(B)(1)(d), we find that the children had been with the Falls foster family for more than three consecutive years at the time of the October 2016 dispositional hearings.

{¶46} In summary, the evidence shows that Father was aware that his case plan goals concerned appropriate housing and mental health services. Nonetheless, Father made insufficient progress in these areas during the pendency of this case. Upon review, we find clear and convincing evidence in the record to support the juvenile court's findings under R.C. 2151.414(D) and (E).

**<u>Compliance with 25 U.S.C. 1912</u>**

**{¶47}** Congress enacted the Indian Child Welfare Act ("ICWA") in 1978 "for the protection and preservation of Indian tribes and * * * Indian children who are members of or are eligible for membership in an Indian tribe * * *." 25 U.S.C. 1901(2) and (3). ICWA applies to pending court proceedings, including custody cases, "where the court knows or has reason to know that an Indian child is involved * * *." 25 U.S.C. 1912(a). This court has held that to invoke ICWA, "there must be a preliminary showing that a custody proceeding involves an 'Indian child.'" *In re N.H.*, 8th Dist. Cuyahoga No. 103574, 2016-Ohio-1547, ¶ 12.

**{¶48}** In the case at hand, it does not appear from the record that Native American ancestry or ICWA was raised in the juvenile court proceedings. However, in response to this court's September 21, 2017 sua sponte order, Father claims "Native American ancestry in the Cherokee and Blackfoot tribes." To meet the burden of proving that a child is an "Indian child" under ICWA, "the party asserting the applicability of ICWA must do more than raise the possibility that a child has Native American ancestry." *In re D.S.*, 8th Dist. Cuyahoga No. 101906, 2015-Ohio-2042, ¶ 16. Therefore, under the facts of the instant case, we find that the court complied with ICWA.

**{¶49}** Accordingly, the court did not err by granting permanent custody of the children to CCDCFS, and Father's sole assigned error is overruled.

**{¶50}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the Cuyahoga County Common Pleas Court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

PATRICIA ANN BLACKMON, JUDGE

LARRY A. JONES, SR., J., CONCURS;
EILEEN A. GALLAGHER, A.J., CONCURS
WITH SEPARATE OPINION

EILEEN A. GALLAGHER, A.J., CONCURRING WITH SEPARATE OPINION:

**{¶51}** I concur with the opinion of my learned colleagues but feel compelled to write separately regarding my concerns about the suitability of the current foster care placement.

**{¶52}** The evidence in this case is scant as to the living conditions in the foster home. There was testimony that now living in the home are foster mother, foster father, A.C., B.B., C.C. and J.S. III (the minors subject to the current litigation and companion cases now before this court.)

**{¶53}** In addition to those six people, testimony reflects that there are an unspecified number of tenants in the home whose identity was not revealed and there is no testimony as to the backgrounds of these persons.

**{¶54}** In addition, there are numerous animals in the home as well as a suggestion that there are also two adult, biological children of the foster parents in the home and, again, there is no testimony as to their backgrounds.

**{¶55}** There was no testimony offered that these other persons, i.e. tenants and adult biological children have been investigated as to mental health issues, substance abuse issues, or criminal records.

**{¶56}** In addition, the record reflects that there are one and half bathrooms in the foster home that are used by up to nine adults and the four children.

**{¶57}** For those reasons, although I agree to the permanent custody being awarded to Cuyahoga County Division of Children and Family Services, I believe that the current placement be investigated.