[Cite as *In re L.R.D.*, 2019-Ohio-178.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### No. 107301

---

### IN RE: L.R.D., ET AL.
### Minor Children

[Appeal By S.D., Father]

---

**JUDGMENT:**
AFFIRMED

---

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD17906123 and AD17906124

**BEFORE:** E.T. Gallagher, P.J., Blackmon, J., and Keough, J.

**RELEASED AND JOURNALIZED:** January 17, 2019

**ATTORNEYS FOR APPELLANTS**

**For Father**

Timothy R. Sterkel
1414 S. Green Road, Suite 310
Cleveland, Ohio 44121

**For D.S.**

Mark Stanton
Cuyahoga County Public Defender

BY:    Aaron T. Baker
Assistant Public Defender
Courthouse Square, Suite 200
310 Lakeside Avenue
Cleveland, Ohio 44113


**ATTORNEYS FOR APPELLEES**

**For CCDCFS**

Michael C. O'Malley
Cuyahoga County Prosecutor

BY:    Warren W. Griffin
          Michelle A. Myers
Assistant Prosecuting Attorneys
CCDCFS
3955 Euclid Avenue, 3rd Floor
Cleveland, Ohio 44115


**ATTORNEYS FOR APPELLEES (Continued)**

**ALSO LISTED**

**For Mother**

Elba Gisella Martinez Heddesheimer
P.O. Box 360608

Strongsville, Ohio 44136

John M. Stryker
20006 Detroit Road, Suite 310
Rocky River, Ohio 44116

**For Children**

Jessica K. Jump
Bartos & Bartos, L.P.A.
27300 Center Ridge Road
P.O. Box 450933
Westlake, Ohio 44145

**Guardian Ad Litem**

Christina M. Joliat
P.O. Box 391531
Solon, Ohio 44139

EILEEN T. GALLAGHER, P.J.:

**{¶1}** Appellant ("Father") appeals a judgment of the Cuyahoga County Common Pleas Court, Juvenile Division, granting permanent custody of his minor children, R.D. and S.D., to appellee Cuyahoga County Department of Children and Family Services ("CCDCFS" or "the agency"). He claims the following three errors:

> 1. The trial court committed error when it proceeded with the permanent custody hearing without complying with 25 U.S.C. 1912.
>
> 2. The trial court committed error when it terminated appellant's parental rights and granted permanent custody to CCDCFS.
>
> 3. Appellant was denied effective assistance of counsel.

**{¶2}** We find no merit to the appeal and affirm the trial court's judgment.

## I. Facts and Procedural History

**{¶3}** On April 18, 2017, police were called to an extended-stay motel room where they found R.D. and S.D. in close proximity to hypodermic needles and other drug paraphernalia. Father and his wife, the children's mother ("Mother"), were under the influence of drugs, and the children were hungry. (Tr. 22.) The parents were subsequently charged and convicted of child endangering, and the children were taken into agency custody.

**{¶4}** Joyce Butler, a social worker assigned to the case, testified at the permanent custody hearing that CCDCFS developed a case plan for the parents with the goal of reunification. Both parents had been addicted to heroin for twenty years. Father was also addicted to methamphetamine and had previously been diagnosed with schizophrenia. Years earlier, the couple's two older children, who were 18 and 20 years old at the time of trial, had been placed in the legal custody of their paternal grandmother as a result of their parents' drug abuse and multiple incarcerations.

**{¶5}** Butler testified that, in June 2017, she referred Father to Recovery Resources for a drug assessment to determine the appropriate course of treatment. Father failed to appear for the appointment, telling Butler he did not know how to get to the appointment. Butler referred Father for a second assessment at MetroHealth in July 2017. This was a dual diagnosis program designed to treat Father's substance abuse and mental health issues. Father appeared for the initial appointment, but failed to return for the second appointment to complete the assessment. He told Butler that he missed the second appointment because he did not have a ride. Butler referred Father for a third assessment in September 2017, but he missed that appointment because he was incarcerated for violating his probation as a result of a positive drug test and failure to report.

{¶6} Butler testified that she attempted to assist Father in obtaining housing for himself and his children. She scheduled a meeting with Father to make a housing referral, but he failed to attend the meeting. Butler was unable to further assist Father in obtaining housing once he was imprisoned, and he was still in prison at the time of the permanent custody trial.

{¶7} Father visited the children for two hours every week until he was incarcerated. Butler testified that Father loves his children, but the visits were always supervised due to Father's continued drug use. Father admitted to Butler that he visited the children while he was high on drugs. (Apr. 11, 2018 tr. 35.) There had also been a threat that the family would take the children from the foster home. Butler did not believe it was in the children's best interest to visit Father in jail, particularly since they were already exhibiting significant behavioral issues. Consequently, Father had no visits with the children from August 2017 through the time of the permanent custody hearing on April 11, 2018.

{¶8} Upon entering temporary custody, the children were placed in a foster home where they remained throughout the pendency of the case. The children were quiet at first and L.D., who was eight years old, was very protective of her younger sister. A few months later when the children were adjusted to their foster home, they told their foster mother about their family life before foster care. They explained that their maternal grandmother took them shoplifting at Macy's and Sears. The children's parents also shoplifted with them. They called it "boosting," and taught the children to "run real fast" if they get caught. (Apr. 11, 2018 tr. 82.) L.D. and S.D. re-enacted their shoplifting experiences, as well as their parents' drug and alcohol abuse, with their Barbie dolls. (Apr. 11, 2018 tr. 102.)

{¶9} The children's foster mother testified that the children's behavior significantly improved during the time they were in foster care. She explained that when the children entered

foster care, they were loud and did not know how to behave. For example, when they went to restaurants, S.D. "might stand up on a chair and yell across the restaurant, hey you, I need a new drink[.]" (Apr. 11, 2018 tr. 100.) Shopping with the children was challenging "because they were doing cartwheels and they were touching things, and [foster father] just couldn't control them in the store." (Apr. 11, 2018 tr. 110.)

{¶10} The children were also behind in their education. L.D. was eight years old and had never been to school or had any kind of education. The foster mother requested learning disability services and was told that L.D. was not eligible for those services because she was not learning disabled; she was "educationally neglected." (Apr. 11, 2018 tr. 106.) Consequently, L.D. was placed in first grade even though she should have been in third grade, and her foster family arranged for tutoring outside of school. By the end of one year, L.D. was reading picture books and getting straight A's in school.

{¶11} L.D. also needed counseling when she entered foster care. She did not respond well when people told her "no." At one point, she threatened to cut herself with a blade as she had seen her older sister do when she did not get what she wanted. (Apr. 11, 2018 tr. 100.) Father admitted to Butler that when he had custody of the children, he gave them whatever they wanted, even if he had to steal for them. (Apr. 11, 2018 tr. 49.)

{¶12} S.D., who was five years old at the time of the permanent custody trial, was also behind in learning the alphabet and had behavior problems. Her problems improved, but she was still struggling in school at the time of the permanent custody trial and was likely to repeat kindergarten. However, both children were eventually able to accept "no" for an answer without having a tantrum or threatening to harm themselves. They could also go out in public without

causing a scene. They were no longer timid and developed a close attachment to their foster family, including aunts and grandparents. (Apr. 11, 2018 tr. 114-115.)

{¶13} CCDCFS investigated family members for possible placement of the children. The children's paternal grandmother was not approved because of her extensive criminal record, which included an aggravated murder conviction in 1972 and a child endangering conviction in 2015. The paternal grandmother also failed to appropriately parent L.D. and S.D.'s older siblings when they were in her legal custody. The children's great uncle, B.D., told Butler he was unable to care for the children and believed a foster family would provide the best care for the children. (Apr. 11, 2018 tr. 42.)

{¶14} Another great uncle, R.D., expressed a willingness to take legal custody of the children and, in January 2018, Father filed a motion for legal custody of the children to be granted to R.D. However, when Butler visited his home, the home was full of smoke because he was a heavy smoker. Butler was concerned the smoke would be harmful to the children, especially L.D., who had asthma.

{¶15} R.D. testified at the permanent custody trial that he had recently quit smoking, but Butler was still concerned that he did not understand the educational and behavioral needs of the children. When Father and the children were living with R.D., R.D. did nothing to help to enroll L.D. in school. R.D. helped raise Father and Father's older children. Yet, at the time of the permanent custody hearing, both Father and one of his older children were incarcerated. Butler was also concerned that R.D.'s home was not large enough to accommodate the children.

{¶16} At the time of the permanent custody trial, the children had been in temporary custody for 358 days, and Father had not completed any drug treatment program to address his 20-year addiction. He was also incarcerated, and was, therefore, unable to obtain stable housing.

Butler opined that the children's progress would suffer if they remained in temporary custody and that permanent custody was in the children's best interest. (Apr. 11, 2018 tr. 51.) The foster mother agreed that the children did not like being known as foster children and that they wanted permanency. She believed that the longer the children remained in a temporary situation, the more harm it would do to them. (Apr. 11, 2018 tr. 163.) The guardian ad litem, Christina Joliat, also believed that an order granting permanent custody to CCDCFS was in the children's best interest. She told the trial court that because the children's entire lives have been "in such upheaval," they only recently "started to improve and enjoy themselves as children." (Apr. 11, 2018 tr. 165-166.)

{¶17} After receiving testimony and exhibits and proposed findings of fact and conclusions of law submitted by the parties, the trial court granted permanent custody of the children to CCDCFS. Father now appeals the trial court's judgment.

## II. Law and Analysis

### A. Indian Child Welfare Act

{¶18} In the first assignment of error, Father argues the trial court erred in holding a permanent custody hearing without first complying with the Indian Child Welfare Act ("ICWA"), codified in 25 U.S.C. 1912. He contends the court was required by the ICWA to notify L.D. and S.D.'s Indian tribe before proceeding with the permanent custody hearing because the court had "'reason to know that an Indian child was involved.'" (Appellant's brief at 11, quoting 25 U.S.C. 1912.)

{¶19} The ICWA was enacted in 1978 because a large number of Native American children were being placed in non-Native American foster and adoptive homes. *See* 25 U.S.C. 1901(4). Congress enacted the ICWA

to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture[.]

25 U.S.C. 1902. The act accomplishes these goals by providing certain procedural safeguards in child custody proceedings when the subject child is an Indian child. However, the ICWA only requires that a tribe be notified of permanent custody proceedings when the court "knows or has reason to know that an Indian child is involved." 25 U.S.C. 1912(a). Therefore, in order to invoke the provisions of the ICWA, there must be a preliminary showing that a custody proceeding involves an "Indian child." *In re S.F.*, 8th Dist. Cuyahoga No. 106738, 2018-Ohio-2404, ¶ 18, citing *In re A.C.*, 8th Dist. Cuyahoga No. 99057, 2013-Ohio-1802, ¶ 41, citing *In re Williams*, 9th Dist. Summit Nos. 20773 and 20786, 2002-Ohio-321, ¶ 22.

**{¶20}** An "Indian child" is defined as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe[.]" 25 U.S.C. 1903(4). Multiple courts, including this court, have held that the party invoking the ICWA bears the burden of establishing that the IWCA is implicated. *See, e.g.*, *In re A.C.*, at ¶ 41; *Geouge v. Traylor*, 68 Va.App. 343, 808 S.E.2d 541 (Va.2017); *In re Trever I*, 973 A.2d 752, 759 (Me. 2009); *People v. Diane N.*, 196 Ill.2d 181, 752 N.E.2d 1030, 1044 (Ill. 2001); *In re A.S.*, 614 N.W.2d 383, 385-386 (S.D. 2000); *In re Interest of J.L.M.*, 451 N.W.2d 377, 387 (Neb. 1990).

**{¶21}** To meet this burden, the party asserting the applicability of the ICWA must do more than simply raise the possibility that a child has Native American ancestry. *Id.*, citing *In re B.S.*, 184 Ohio App.3d 463, 2009-Ohio-5497, 921 N.E.2d 320, ¶ 63 (8th Dist.). Having Native American ancestry, by itself, does not make one an "Indian child" for purposes of the ICWA.

*Geouge* at 361. Rather, the party invoking the act must demonstrate that the child meets the definition of an "Indian child" under the act.

{¶22} The trial court inquired of both parents at multiple pretrials regarding the existence of any Native American ancestry. Father repeatedly told the court that he had no Native American ancestry. (Aug. 29, 2017 tr. 10; July 13, 2017 tr. 5-6.) With respect to Mother, the following exchange took place:

> [MOTHER]: My dad is an Iroquois tribe, but I don't know if he's registered, but, I mean, his family is all native Americans and stuff. Yes, they are.
>
> [COUNSEL]: But what we need to know is whether you yourself are registered with a tribe.
>
> [MOTHER]: Oh, no.
>
> [COUNSEL]: You're not. Okay. That's what we needed. Thank you, your Honor.
>
> THE COURT: Okay.
>
> [COUNSEL]: So ICWA does not apply then.
>
> THE COURT: Okay. You're definitely not registered?
>
> [MOTHER]: No, sir.

(Jan. 16, 2018 tr. 5-6.)

{¶23} Thus neither L.D. nor S.D. are members of a tribe, and Mother, herself, is not a member of any tribe. Although Mother alleged that her father is an Iroquois, L.D. and S.D. are not his children; they are his grandchildren. As previously stated, the ICWA defines an "Indian child" as any minor child who is either a member of an Indian tribe or "is eligible for membership in an Indian tribe and is the biological *child* of a member of an Indian tribe." 25 U.S.C. 1903(4) (Emphasis added.) A grandchild of a member of an Indian tribe falls outside the

definition and therefore does not qualify as an "Indian child" under the act. Therefore, the ICWA is inapplicable, and the trial court was not required to comply with its mandates.

{¶24} Accordingly, the first assignment of error is overruled.

## B. Permanent Custody

{¶25} In the second assignment of error, Father argues the trial court committed error when it terminated his parental rights and granted permanent custody of L.D. and S.D. to CCDCFS. He contends the trial court should have extended temporary custody for an additional six months to give Father the opportunity to address the issues that caused the children to be removed from him. He also asserts that a suitable relative was available to care for the children while Father worked on his case plan.

{¶26} R.C. 2151.414 sets forth a two-part test courts must apply when deciding whether to award permanent custody to a public services agency. R.C. 2151.414 requires the court find, by clear and convincing evidence, that (1) granting permanent custody of the child to CCDCFS is in the best interest of the child, and (2) either the child (a) cannot be placed with either parent within a reasonable period of time or should not be placed with either parent if any one of the factors in R.C. 2151.414(E) are present; (b) is abandoned; (c) is orphaned and no relatives are able to take permanent custody of the child; or (d) has been in the temporary custody of one or more public or private children services agencies for 12 or more months of a consecutive 22-month period. R.C. 2151.414(B)(1).

{¶27} "'Clear and convincing evidence' is evidence that 'will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established.'" *In re C.B.*, 8th Dist. Cuyahoga No. 92775, 2011-Ohio-5491, ¶ 28, quoting *Cross v. Ledford*, 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954).

**{¶28}** In determining that a child cannot be placed with either parent within a reasonable time or should not be placed with either parent, the trial court must consider the factors contained in R.C. 2151.414(E). If the court determines at a hearing that one or more of the factors set forth in R.C. 2151.414(E) exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable period of time or should not be placed with either parent. *In re I.K.*, 8th Dist. Cuyahoga No. 96469, 2011-Ohio-4512, ¶ 8. The existence of any one of the factors is sufficient to determine that a child cannot be placed with a parent within a reasonable period of time. *In re C.C.*, 187 Ohio App.3d 365, 2010-Ohio-780, 932 N.E.2d 360, ¶ 10 (8th Dist.), citing *In re William S.*, 75 Ohio St.3d 95, 661 N.E.2d 738 (1996).

**{¶29}** The trial court found that five of the factors enumerated in R.C. 2151.414(E) existed. Specifically, the court found:

> Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. [R.C. 2151.414(E)(1)]

> The chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year. [R.C. 2151.414(E)(2)]

> The parent is incarcerated for an offense committed against the child or a sibling of the child. [R.C. 2151.414(E)(5)]

> The parents are repeatedly incarcerated, and the repeated incarceration prevents the parent from providing care for the child. [R.C. 2151.414(E)(13)]

> The parent has committed abuse against the child or caused or allowed the child to suffer neglect as described in section 2151.03 of the Revised Code, and the court determines that the seriousness, nature, or likelihood of recurrence of the abuse or

neglect makes the child's placement with the child's parent a threat to the child's safety. [R.C. 2151.414(E)(15)]

**{¶30}** Clear and convincing evidence supports these findings. Although Butler referred Father for a drug assessment three times, Father never completed an assessment. Father admitted that he had schizophrenia, but failed to pursue mental health treatment following a referral to MetroHealth for substance abuse and mental health treatment. There was also evidence that Father had previously been incarcerated and was incarcerated at the time of the permanent custody trial.

**{¶31}** When the children were taken into custody, Father was charged with, and subsequently convicted of, child endangering for endangering the lives of L.D. and S.D. A certified copy of the child endangering conviction was introduced at trial. Moreover, the child endangering charges were filed after police found the children in an extended-stay motel room in close proximity to hypodermic needles and drug paraphernalia while their parents were intoxicated. The parents' addictions left the children neglected and hungry. Therefore, there is clear and convincing evidence to support the court's findings under R.C. 2151.414(E), and the trial court properly found that the children could not, and should not, be placed with either parent within a reasonable time. R.C. 2151.414(B)(1)(a).

**{¶32}** Having determined that the second prong of the two-part test set forth in R.C. 2151.414 was satisfied, we now turn to the first part of the test, which considers the best interests of the children. In making the "best interest" determination, R.C. 2151.414(D)(1) directs the trial court to consider the following non-exclusive factors:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to CCDCFS;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶33} This court has consistently held that only one of the factors set forth in R.C. 2151.414(D) needs to be resolved in favor of the award of permanent custody in order for the court to award permanent custody to a proper agency. *In re J.M-R.*, 8th Dist. Cuyahoga No. 98902, 2013-Ohio-1560, ¶ 37, citing *In re Z.T.*, 8th Dist. Cuyahoga No. 88009, 2007-Ohio-827, ¶ 56.

{¶34} It is undisputed that Father loves his children and they love him. However, Father neglected his children, and showed his love by giving the children material things, even if he had to steal in order to provide them. At the time of the permanent custody hearing, the children had not seen their father in approximately seven months due to his incarceration. During that time, the children developed positive and meaningful relationships with members of their foster family.

{¶35} Although the children initially wanted to live with their father, L.D. later expressed a desire to be adopted by her foster family. This sentiment was confirmed by the guardian ad

litem, who recommended that the trial court grant permanent custody of the children to CCDCFS.

{¶36} Further, the children had been in agency custody for one year at the time of the permanent custody trial. Father was incarcerated for more than eight months of that year and was not eligible for release for an additional five months. Mother was also incarcerated for the majority of the time the children were in temporary custody, and Mother failed to address her substance abuse problems. Therefore, the children had no prospect of being reunited with either of their parents in the foreseeable future, particularly since they had not addressed the reasons for the children's removal in the first place. Therefore, the evidence established that a legally secure placement could not be achieved without a grant of permanent custody.

{¶37} Father argues the trial court should have extended temporary custody for an additional six months to allow Father to address the issues that caused the children to be removed from him. He asserts that a short extension would not harm the children. However, as previously stated, Father was going to be incarcerated for an additional five months after the permanent custody trial, and he had not yet started drug and mental health treatment. Father has been trying to resolve his substance abuse problems for decades. His older children were placed in the legal custody of their paternal grandmother when they were younger because Father was unable to care for them. Under these circumstances, it was reasonable for the court to conclude that an extra six months was not likely to result in a successful reunification, and the children needed permanency now.

{¶38} Father argues the trial court should have granted legal custody to R.D. However, the evidence does not support a finding R.D. could provide a secure and permanent home for the children. As previously stated, R.D. failed to assist Father in enrolling L.D. in school when they

lived together. When asked if R.D. ever considered trying to obtain legal custody of the children years ago in order to protect them from Father's drug addiction, he replied that he "wanted to do the right thing" but he "didn't know how [Father] was gonna approach me." (Apr. 11, 2018 tr. 145.) R.D.'s testimony also indicated that he did not understand L.D.'s medical needs. He believed she contracted asthma from swimming in a "nasty lake" while she was in foster care.

{¶39} Furthermore, R.D. helped raise Father and Father's two older children. Neither Father nor his older children graduated from high school. Moreover, Father and one of the older children were incarcerated at the time of the permanent custody trial. According to R.D., the second of Father's older children was pregnant by "the biggest time [drug] dealer that ever walked." (Apr. 11, 2018 tr. 145.) The trial court had the opportunity to observe R.D. and reasonably concluded that he would not provide the children with a stable and permanent home.

{¶40} The record demonstrates that the trial court complied with the statutory requirements of R.C. 2151.414 in determining that the children could not be placed with either parent within a reasonable time and that an award of permanent custody to CCDCFS was in the children's best interests. And the trial court's findings are supported by clear and convincing evidence.

{¶41} Therefore, the second assignment of error is overruled.

### C. Ineffective Assistance of Counsel

{¶42} In the third assignment of error, Father argues he was denied the effective assistance of counsel because his trial counsel failed to object to the permanent custody trial even though the trial court had complied with the requirements of the ICWA. However, as previously determined, the ICWA is not applicable to this case. Therefore, counsel was not ineffective for not objecting on that basis.

**{¶43}** The third assignment of error is overruled.

**{¶44}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the Cuyahoga County Common Pleas Court, Juvenile Division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

EILEEN T. GALLAGHER, PRESIDING JUDGE

KATHLEEN ANN KEOUGH, J., CONCURS;
PATRICIA ANN BLACKMON, J., CONCURS IN JUDGMENT ONLY WITH SEPARATE OPINION

PATRICIA ANN BLACKMON, J., CONCURRING IN JUDGMENT ONLY

**{¶45}** I concur in judgment only with the majority's opinion and write separately to address the juvenile court's duty to comply with ICWA. In *In re A.C.*, 8th Dist. Cuyahoga No. 105336, 2018-Ohio-384, this court remanded a permanent custody case to the juvenile court to comply with our holding in *In re R.G.*, 8th Dist. Cuyahoga No. 104434, 2016-Ohio-7897. *In re R.G.* holds that "the trial court has a duty under the ICWA to make an inquiry to the participating putative parents." *Id.* at ¶ 18. Upon further review, I believe that the holding in *In re R.G.* is too narrow and that compliance with ICWA can be accomplished in myriad ways.

**{¶46}** In my view, the rights preserved under ICWA belong to the "parent or Indian custodian and the Indian child's tribe." 25 U.S.C. 1912(a) states in part as follows:

> In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention.

**{¶47}** If the court knows or has reason to know that a case involves a statutorily defined Indian child, notice of the proceedings must be sent to the appropriate Indian tribe, or, if the identity of the parent or tribe cannot be determined, notice must be sent to the secretary of the interior. 25 U.S.C. 1912(a). It is unclear from the current law in this state what triggers the tribal-notice requirement of 25 U.S.C. 1912(a). The Michigan Supreme Court recently explored this issue in *In re Morris*, 491 Mich. 81, 88, 815 N.W.2d 62 (2012):

> While it is impossible to articulate a precise rule that will encompass every possible factual situation, in light of the interests protected by ICWA, the potentially high costs of erroneously concluding that notice need not be sent, and the relatively low burden of erring in favor of requiring notice, we think the standard for triggering the notice requirement of 25 USC 1912(a) must be a cautionary one. Therefore, we hold first that sufficiently reliable information of virtually any criteria on which tribal membership might be based suffices to trigger the notice requirement. We hold also that a parent of an Indian child cannot waive the separate and independent ICWA rights of an Indian child's tribe * * *.

**{¶48}** The key to determining whether a child is an Indian child lies in tribal membership or eligibility for tribal membership. 25 U.S.C. 1903(4). Tribal membership is self-determined. *See In re Junious M*., 144 Cal.App.3d 786, 193 Cal.Rptr. 40 (1983). The *In re Morris* court framed the issue as follows: "Specifically, how much information suggesting the child has or may have Indian heritage suffices to give the court 'reason to know' that an Indian child is involved?" *In re Morris* at 104.

**{¶49}** The Bureau of Indian Affairs issued guidelines in 1979, which remain helpful today. Circumstances under which a court may have "reason to know" that a custody proceeding involves an Indian child include, but are not limited to, the following:

> (i) Any party to the case, Indian tribe, Indian organization, or public or private agency informs the court that the child is an Indian child.

> (ii) Any public or state-licensed agency involved in child protection services or family support has discovered information which suggests that the child is an Indian child.

> (iii) The child who is the subject of the proceeding gives the court reason to believe he or she is an Indian child.

> (iv) The residence or the domicile of the child, his or her biological parents, or the Indian custodian is known by the court to be or is shown to be a predominantly Indian community.

> (v) An officer of the court involved in the proceeding has knowledge that the child may be an Indian child.

Bureau of Indian Affairs, Guidelines for State Courts; Indian Child Custody Proceedings, B.1(c), 44 Fed. Reg. 67584, 67586 (Nov. 26, 1979).

**{¶50}** Courts in other jurisdictions have also determined that the threshold is low to trigger notice to the tribe. "Because membership is peculiarly within the province of each Indian tribe, sufficiently reliable information of virtually any criteria upon which membership

might be based must be considered adequate to trigger the notice provisions of [ICWA]." *B.H. v. People ex rel. X.H.*, 138 P.3d 299, 304 (Colo.2006). *See also In re Antoinette S.*, 104 Cal.App.4th 1401, 129 Cal.Rptr. 2d 15 (Cal.App.2002).

{¶51} In the case at hand, the focus of the inquiry related to ICWA was whether Mother was "registered" with a tribe. Although this may be a distinction without a difference, to be certain, the focus should be on whether the child is a member of an Indian tribe or eligible for membership and is the biological child of an Indian tribe member. While I agree with the outcome of this case, I believe that this court's law concerning compliance with ICWA may need to be developed further as cases present themselves. This is of particular concern in light of *Brackeen v. Zinke*, 2018 U.S. Dist. LEXIS 173115 (N.D. Texas, Oct. 4, 2018), which declared sections 1901-1923 and 1951-1952 of ICWA unconstitutional as being in violation of the Tenth Amendment Anti-Commandeering Clause; the Article I nondelegation clause; and the Fifth Amendment Equal Protection Clause of the U.S. Constitution.

{¶52} I have always been of the opinion that when the court receives information from an agency, a tribe, a parent, or another reputable source that the child is or may be an Indian child, the party seeking termination of parental rights must notify the alleged tribe of the proceedings. This is the least it could do.

{¶53} In this case, the prosecutor for the agency seemed to suggest a balancing approach, arguing that permanency outweighs the rights of the child and the Indian tribe. I disagree. The child's heritage outweighs any other concerns.

> Congress hereby declares that it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children

in foster or adoptive homes which will reflect the unique values of Indian culture
\* \* \*.

25 U.S.C. 1902.