NOT DESIGNATED FOR PUBLICATION

No. 122,197

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of T.W. and J.W.,
MINOR CHILDREN.

MEMORANDUM OPINION

Appeal from Douglas District Court; BETHANY J. ROBERTS, judge pro tem. Opinion filed July 10, 2020. Affirmed.

*Rachel I. Hockenbarger*, of Topeka, for appellant.

*Kate Duncan Butler*, assistant district attorney, and *Charles E. Branson*, district attorney, for appellee.

Before Warner, P.J., Malone and Bruns, JJ.

PER CURIAM: The natural father of two minor children appeals the district court's termination of his parental rights. Although the district court also terminated the parental rights of the natural mother, she did not appeal. Based on our review of the record, we find that the State has established by clear and convincing evidence that the father's parental rights should be terminated. In addition, we find that the district court did not err in determining that termination of the father's parental rights is in the best interests of the children. We also find that the district court correctly applied the statutory presumptions in this case. Finally, we find that the district court properly determined that the Indian Child Welfare Act is not applicable to this case. Thus, we affirm the district court's decision terminating the parental rights.

1

T.W. was born in 2011 and J.W. was born in 2013. The father and mother were married following the birth of T.W. but prior to the birth of J.W. Before she entered into a relationship with the father, the mother had four children from a previous relationship. However, they were removed from her in 2009 and did not reside with her during the times relevant to this action.

While the family was living with relatives in Iola, Kansas, the State temporarily took T.W. into protective custody after both parents were arrested. On January 30, 2015, shortly after the family moved to Lawrence, the police responded to a domestic violence report at the residence. During a verbal altercation, the father had evidently accused the mother of cheating on him and she attacked him with a machete. At the time, the children were in an adjoining room. The mother was arrested and the incident was reported to the Kansas Department for Children and Families (DCF).

A social worker visited the residence and spoke with the father. The social worker observed that the father appeared to be worn out, and the children were screaming. The father admitted that the couple had fought in the past and that the mother had previously stabbed him. About a month later, the mother was released from jail. However, she returned to jail three days later for violating a protective order. On February 20, 2015, the social worker came back to the residence. At that time, both the mother and the father were present. Although the social worker asked about the protective order, both parents assured her that the matter had been dropped.

On February 24, 2015, DCF received another report of domestic violence between the father and the mother. Upon arriving at their house, police officers found that the father had blood on his shirt and arm as well as minor cuts on his face. The officers questioned the father about his injuries. In response, the father denied—in a loud voice—

that anything happened and stated only that the blood was the result of an accident. According to the police, the father exhibited signs of paranoia and told them that federal agents were watching the house due to unspecified criminal activity in which the mother was involved. Because the father claimed one of the criminals was hiding in the house, the officers conducted a search, but they found no one. Because the father insisted that nothing happened, the police made no arrests on this visit.

The next day, police officers arrested the father for attacking his cousin with an axe. The father alleged that his cousin was stealing electricity and having sex with the mother. After his release from jail the following day, the father rode the bus part of the way and then walked home in extremely cold temperatures. After arriving home, the father slapped the mother in the face and head in front of the children. In turn, the mother retaliated with physical violence of her own—throwing a plate at the father and threatening him with a knife.

The couple continued to fight and the mother finally ran outside screaming. A neighbor witnessed the father follow the mother outside, grab her arm, and force her back inside the house. The neighbor called the police and officers could hear the couple yelling at each other when they arrived. The police ultimately arrested the father and took him to the hospital for treatment for superficial wounds to his forearms and elbow before taking him to jail.

On March 9, 2015, a social worker from DCF went to the family's residence and spoke to the mother. At the time, the father was still in jail. After questioning the mother about the domestic violence incidents, the social worker expressed concerns about the welfare of the children and offered family preservation services in an attempt to keep the children from being removed from the home. The mother agreed to accept family preservation services. A few days later, the social worker spoke with the father at the jail, and he also agreed to accept family preservation services.

3

On March 13, 2015, the father was released from jail. Three days later, the mother called the social worker to ask when she would be coming to their home. When the social worker explained that another social worker with family preservation services had been trying to contact the parents, the mother explained that she was moving out of the residence. Shortly after her call with the mother ended, the social worker received a call from the father, wanting assistance with food stamps. During the call, the social worker could hear Mother yelling in the background. The father claimed that the family did not need preservation services. When the family preservation services worker arrived at the residence later that day, the father was irritable and refused to submit to a urine analysis (UA).

On March 17, 2015, two social workers visited the family's residence. The social workers found both the mother and the father to be defensive and hostile. The couple expressed reluctance in obtaining family preservation services. The father demanded assistance with his request for food stamps. As the social workers tried to explain the type of services they could provide, the father became more confrontational. In particular, he yelled profanities at the social workers and threatened to call the police if they showed up at the house again. Although the children began crying, neither parent attended to them and the social workers decided to leave. The father followed the social workers out of the house and continued to shout profanities at them.

Because of concerns for the children's welfare arising from the violent behavior displayed by the parents as well as their rejection of family preservation services, DCF submitted a report to the Douglas County District Attorney's office. In the report, the DCF recommended that the children be placed in the temporary custody of the State. In response, the District Attorney petitioned the district court for an ex parte order of temporary custody order. The district court granted the petition on March 20, 2015, and placed the children in the temporary custody of the DCF.

4

Just four days later, the mother went to the Lawrence Police Department to report that the father had been slipping drugs into her food. In addition, she alleged that the father allowed individuals to enter their home to have sex with her while she was drugged. On the same day, a social worker reported that T.W. displayed signs of significant developmental delays, exhibited by a failure to respond to stimuli around her.

The next day, the State filed a petition alleging that T.W. and J.W. were children in need of care (CINC). In the petition, the State alleged—among other things—that the children were without adequate parental care, control or subsistence not solely due to the parents' financial means; the children were without the care or control necessary for their physical, mental, and emotional health; and the children had been physically, mentally, or emotional abused or neglected. The district court adopted the recommended temporary orders presented by the State.

The mother visited the children at the Kaw Valley Center (KVC) on March 26, 2015. However, the father did not attend the visit because he was in jail. Because a no-contact order was in place prohibiting the parents from seeing one another, KVC arranged separate visits between the children and each parent. On April 5, 2015, the father visited the children for the first time since they were placed in temporary custody. The case worker recorded no significant negative parenting conduct during this visit.

On April 16, 2015, the mother was arrested for domestic violence against the father. A few days later, the father became upset at the children's clothing and hair during a visit. He also became animated while discussing the case plan with the social worker observing the visit. Because the social worker was unable to redirect the father to interact with his children, the visit ended early.

Subsequently, a social worker advised the parents that they qualified for the Kansas Intensive Parenting Program (KIPP), which is a grant program offered by the

5

University of Kansas to help reunite families more quickly. Unfortunately, the father was dismissed from the program after only a few sessions. He was told that he could return once he had successfully completed a batterer's intervention program. However, the father never returned to the KIPP program because he never successfully completed a batterer's intervention program.

On April 21, 2015, the no-contact order expired. Two days later, both the mother and the father requested joint visits with the children. They reported that they were committed to their relationship and wanted to work together towards reuniting the family. In response, KVC scheduled joint visits with the children. During the joint visits occurring in April, the social worker reported that the parents appropriately divided their time between the children.

On April 30, 2015, the DCF filed its first case plan report with the court. In doing so, DCF identified three permanency objectives: (1) meeting the needs of the children; (2) reintegration of the children with the mother; and (3) reintegration of the children with the father. Regarding the father, the case plan identified the following tasks:

- Completing anger management classes;
- obtaining a parenting and psychological evaluation and following its recommendations;
- participating in parenting classes;
- completing an alcohol and drug assessment and following the recommendations made as a result of the assessment;
- submitting to random UA's and avoidance of the use of illegal drugs and the abuse of alcohol;
- adhering to the conditions of his probation;

6

- participating in marriage counseling if the no-contact order is lifted and if the parents remained in a relationship;
- cooperating with the social service agencies in obtaining necessary releases for the children;
- providing financially for the children through employment or public assistance; and
- providing a safe and stable home environment for the children.

At a visit scheduled for May 4, 2015, a mix-up with transportation prevented J.W. from attending. Both parents were understandably upset but had a difficult time moving past the mistake. Instead of devoting their time to T.W., the parents chose to engage the social worker. Eventually, the social worker redirected the father to spend time with T.W., but the mother continued to complain and left the room. Toward the end of the visit, she returned and spent the remaining time looking at books with the father and T.W.

KVC attempted to arrange a telephone call between the parents and J.W. the following day. A social worker texted the call-in information and time, and the mother acknowledged receipt of the message. At the prearranged time, neither parent called in even though J.W. was standing by to talk to them.

A few days later, neither parent appeared for a scheduled visit with the children. However, a social worker called the father and left a message for him. The social worker also called the mother who reported that she was on her way but still had to catch a bus. So, the social worker went and picked up the mother to take her to the visit. The mother told the social worker that the father had held a gun to her head the previous evening.

During the visit, the mother engaged appropriately with the children until the father arrived at 10 a.m. After his arrival, the mother stopped engaging with the children and began needling the father. Ultimately, both parents ended up yelling at each other and

7

ignoring the children. As a result, the social worker ended the visit early. Later, the father called the social worker and communicated his desire to have separate visits with the children.

On May 11, 2015, KVC scheduled separate visits for the parents. The mother visited with the children first. When the father arrived for his visit, he requested that the mother be allowed to stay. The social worker refused the request. Also, the mother reported to the social worker that she was no longer living with the father but at a women's shelter.

The district court held a hearing on the State's CINC petition on May 19, 2015. At the hearing, the parents and the children's guardian ad litem stipulated to the facts as alleged in the petition. Accordingly, the district court adjudicated T.W. and J.W. to be in need of care. The district court ordered that the DCF maintain temporary legal custody of the children and that they remain in their current out-of-home placement. The district court also adopted the recommendations from a social worker at KVC and approved the DCF's proposed case plan.

After the CINC hearing, the father's visits with the children became sporadic. A number of missed visits accumulated as a result of his incarceration. The father was incarcerated during the summer and was released in early September. Even when the father attended visits with the children, he was frequently late or displayed inappropriate behavior towards the social workers that resulted in his visits being terminated early. At one of the visits, it was reported that the father slept for four hours in the KVC lobby.

Nevertheless, the social workers consistently reported that the father's attitude and behavior towards his children were appropriate. On the other hand, they reported that the father did not appropriately handle behavioral problems exhibited by the children. During the summer of 2015, the father completed an alcohol and drug assessment but no

8

treatment was recommended. Although KVC reported that the father was scheduled to obtain another evaluation in September, it is unclear why another assessment was required. Generally, the father submitted to UAs as requested and his test results were always negative. The mother, however, tested positive for cocaine, methamphetamine, and amphetamines on September 10, 2015.

During the summer of 2015, the father also obtained a domestic violence assessment. It was recommended that he complete a batterer's intervention program. Claiming that he did not have the financial resources to do so, the father did not enroll in a batter's intervention program. In fact, a review of the record reflects that the father never completed a batterer's intervention program.

On September 14, 2015, Dr. Jean Dirks—a clinical psychologist—submitted a parenting and psychological evaluation of the father to the district court. Dr. Dirks based her opinions on information received from the case files, interviews with various individuals who knew the father, observations of the father during her interviews with him, and observations of the father during a visit with the children. In her professional opinion, Dr. Dirks diagnosed the father with antisocial personality disorder, intermittent explosive disorder, and an unknown substance abuse disorder.

While acknowledging that the father had never exhibited violence toward the children, Dr. Dirks expressed significant reservations about his ability to parent because of his continued relationship with the mother. Dr. Dirks pointed to the history of mutual violence, the time the father spent in jail, his extramarital relationships, his association with mentally unstable individuals, his failure to follow through with the KIPP program, and his failure to maintain regular contact with KVC as well as his probation officer. According to Dr. Dirks, the combination of antisocial personality disorder and intermittent explosive disorder could impact the father's ability to parent when he was required to deal with teachers, school administrators, or doctors about the children.

9

Meanwhile, on October 1, 2015, DCF submitted a revised case plan to the district court. In the revised case plan, the tasks assigned to the father remained substantially unchanged from the original case plan. About a month later, a court-appointed special advocate (CASA) submitted her report to the district court. The CASA reported that neither parent had stable housing, and that the father was unemployed. She acknowledged that his unemployment was due—at least in part—to his recent release from jail. It was also reported that the mother was pregnant with a due date in May 2016.

Although the father and the mother had declared a desire to remain together, neither had begun anger management classes at the time of the CASA's report. The father had received a domestic violence assessment but had not begun a batterer's intervention program. The CASA also noted that the father had not progressed through many of the tasks ordered in the case plan. She also noted the father's tendency to avoid responsibility, stating that "he seems unable to acknowledge or take responsibility for his part in creating the current situation and instead, tends to blame others (such as caseworkers or the court system) and thus does not follow through on his court-ordered tasks."

On December 1, 2015, the district court issued an order following a Citizen Review Board hearing. In its order, the district court emphasized the need for the father to obtain batterer's intervention services in order to proceed with other case plan tasks. In particular, the district court ordered that the father "shall follow all of the recommendations per Dr. Dirks' report dated September 14, 2015 and shall begin batterer's intervention services as soon as possible, as it is a pre-requisite for him to do this prior to receiving other services including parenting education and marriage counseling."

In February 2016, the State submitted a new case plan. In this plan, the permanency objectives changed from reintegration with both parents to an objective of

10

reintegration of the children with one or the other parent. In the alternative, the plan called for adoption of the children if reintegration was not feasible. Regardless, the father's tasks remained the same as those set forth in the previous case plan. Specifically, the district court ordered the father to complete a batterer's intervention program and the State to work with Father on budgeting.

Although the father began a batterer's intervention program in February 2016, he struggled to attend and was ultimately dismissed from the program for non-attendance. The record reflects that the father missed as many sessions as he attended. It was reported that when he missed a session, the father usually blamed others.

On February 19, 2016, the father obtained another alcohol and drug assessment. Again, no treatment was recommended. But KVC discounted the results of the assessment because the father did not provide the evaluator with Dr. Dirks' parenting and psychological evaluation. KVC feared—given Father's tendency to minimize his own responsibility—the evaluator may not have been given complete information regarding his substance use. Although the father repeatedly failed to comply with his UA call-in schedule, the results were negative whenever he actually submitted to a UA.

In early 2016, the father started living with another woman. His new girlfriend had two children from a previous relationship. According to a parole officer, the father told him that the girlfriend had bipolar disorder and that they often fought. The mother also became involved in a new relationship. Despite these relationships, the father and the mother continued to see each other frequently and neither appeared willing to move forward with divorce proceedings. In mid-April, the father allegedly told the mother that he was glad that she had not pursued a divorce and that he wanted to resume a relationship with her.

11

During this timeframe, KVC increased the father's visits with the children from one hour to an hour and a half. While he normally arrived at the visits on time, he missed three visits in March and April. He blamed his current girlfriend for one of the absences and claimed illness for another. On March 3, the father became agitated because of a UA result that reflected he had used THC. Although the result was ultimately deemed inconclusive, the father loudly exclaimed, "I don't smoke weed. I smoke dope! Not weed. Dope!" The social worker asked him to stop discussing drugs in front of the children.

It was reported by a KVC social worker that on March 10, 2016, the father told her that "they better give his children back soon or else!" He subsequently enrolled in anger management classes. Although a social worker encouraged the father to complete a batterer's intervention program as required in the case plan, he insisted that taking anger management classes was the right thing to do. It is unclear from the record whether he ever completed the anger management classes but it is clear that they would not count toward the father's requirement to attend a batterer's intervention program.

Over the summer, the father made little—if any—progress in completing the tasks required by the case plan. For a period of time, he moved to Manhattan to work for a concrete company. While living in Manhattan, the father stopped calling in for UA's and did not submit to random UAs. In June, the mother gave birth to a baby girl, T.E.W. The following month, T.W. and J.W. were reintegrated with the mother. We cannot determine from the record if T.E.W. is also the father's child. Regardless, she is not the subject of this termination of parental rights case.

Unfortunately, the reintegration of T.W. and J.W. with their mother did not go smoothly. On September 9, 2016, the father took the mother and the children to Manhattan without notifying or obtaining permission of either KVC or DCF. Because the father was not supposed to have unsupervised visits with T.W. and J.W., the State sought and obtained an emergency change of placement order. On September 13, 2016, T.W.

12

and J.W. were removed from the mother's care and placed in a foster home in Topeka. Later in September, the district court issued a restraining order against the father but it does not appear that it was served on him.

In early December 2016, the father moved to Flint, Michigan. However, it is unclear when—or if—he informed his social workers of his new location and he had very little contact with them while he was in Michigan. Over the next ten months, the father remained in Michigan and had no visits with his children. Although he requested video conferences with the children at one point, the request was denied because he had not made sufficient progress on the tasks assigned to him in the case plan. He also asked whether he could attend a fatherhood seminar hosted by the church he was attending as a substitute for parenting classes. But he never responded to a social worker's request for a description of the seminar.

During his time in Michigan, the father posted angry comments on social media about both KVC and DCF. On May 23, 2017, KVC filed another case plan with the district court in which the tasks to be performed by the father remained relatively unchanged. The only new task was to create a parenting plan with the assistance of his court-appointed attorney. In June, the visits with the children were suspended and in July, the district court reissued a restraining order against the father.

At the end of September 2017, the father returned to Kansas and initially stayed with the mother. On October 1, 2017, he was arrested following an altercation at the home and he spent more than six months in jail. While the father was in jail, KVC sent him periodic written updates about the children. However, the children were not permitted to visit him at the jail. On November 27, 2017, KVC filed yet another case plan with the district court but the tasks assigned to the father remained unchanged.

On April 11, 2018, the State filed a motion seeking termination of the parental rights of both parents. In the motion, the State also alleged statutory presumptions of unfitness against the father under K.S.A. 2017 Supp. 38-2271(a)(5) and (a)(6). Subsequently, the State filed an amended motion to correct the father's name but the substance of the motion remained unchanged.

After the father's release from jail on April 18, 2018, he contacted his social worker and informed her that he would communicate through his attorney in the future. The social worker encouraged him to do so to minimize miscommunication. Between the date of his release from jail and the date of the termination hearing, the father changed his place of residence four times. At the time of the termination hearing, the father was living with his sister in Topeka. During this timeframe, the father also held several jobs for short periods of time.

On July 5, 2018, the father contacted his social worker about visits with his children. The social worker noted the restraining order and advised him to speak with his attorney about how to address the tasks he needed to complete before resuming visits. Nevertheless, neither the father nor his attorney contacted the social worker to schedule visits. As a result, the father had no visits with his children—and failed to make progress on the tasks assigned to him in the case plan—between his release from jail and the termination hearing.

The district court commenced a termination hearing on August 7, 2018. Because the mother failed to appear, a default judgment was entered against her and she has not appealed that decision. With regard to the father, the district court found the statutory presumptions of unfitness in K.S.A. 2018 Supp. 38-2271(a)(5) and (a)(6)—which had been alleged by the State in the motion and amended motion for termination of his parental rights—were applicable to the case. Following the termination hearing, the

district court issued a 10-page decision terminating the father's parental rights to T.W. and J.W.

On September 21, 2018, the father timely appealed from the order terminating his parental rights to each of the children. Unfortunately, the appeals were not docketed with this court and the State moved to dismiss them. Although the appeals were initially dismissed by the district court, they were later reinstated by this court. Furthermore, the cases were consolidated for appeal.

ANALYSIS

*Issues Presented and Standard of Review*

On appeal, the father raises four issues. First, whether the district court erred in finding that he was unfit by reason of conduct or condition which renders him unable to properly care for his children and that the conduct or condition is unlikely to change in the future. Second, whether the district court erred in finding that the termination of his parental rights is in the best interests of the children. Third, whether the district court erred in its application of the statutory presumptions of unfitness. Fourth, whether the district court erred in failing to apply the Indian Child Welfare Act, 25 U.S.C. § 1901 et seq. (2016) in these cases.

A parent has a constitutional protected liberty interest in the relationship with his or her chi ld. See *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) (stating the interest of parents in the care, custody, and control of their children is a substantive liberty interest); *In re B.D.-Y*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008). Accordingly, the State may terminate the legal bonds between parent and child only upon "clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition

15

is unlikely to change in the foreseeable future." K.S.A. 2019 Supp. 38-2269(a). If the district court makes such a finding, it must then consider whether termination is in the best interests of the child.

K.S.A. 2019 Supp. 38-2269(b) contains a nonexclusive list of factors for the district court to consider when determining if a parent is unfit. Also, K.S.A. 2019 Supp. 38-2269(c) contains additional factors to consider when a child is not in the physical custody of a parent. Although a single factor may establish a parent's unfitness, the presence of a factor does not automatically establish unfitness. K.S.A. 2019 Supp. 38-2269(f). Ultimately, the primary concern is the physical, mental and emotional health of the children. K.S.A. 2019 Supp. 38-2269(g)(1).

The termination of parental rights requires the district court to make three findings: (1) the parent is unfit as defined by Kansas law; (2) the parent's unfitness is unlikely to change in the foreseeable future; (3) and the termination of parental rights is in the child's best interests. See K.S.A. 2019 Supp. 38-2269(a), and (g)(1). Here, the district court made each of these findings. However, the father challenges the district court's findings and conclusions. We note that the State concedes that the evidence presented at the termination hearing was insufficient to support the district court's finding concerning drug abuse. As such, we will focus on the other factors of unfitness that the district court relied upon.

Regarding the father's contention regarding the Indian Child Welfare Act, a party seeking to invoke a provision of the Act has the burden to show that it applies in a particular proceeding. See *In the Matter of S.K.*, 138 N.E.3d 329, 334 (Ind. Ct. App. 2019). Likewise, the applicability of the Indian Child Welfare Act is dependent upon the definition of the term "Indian child" as defined in 25 U.S.C. § 1903(4) (2016). To meet this burden, the party asserting that the Act applies in a particular case must raise more

than a possibility that a child has Native American ancestry. See *In re B.S.*, 184 Ohio App. 3d 463, 475, 921 N.E.2d 320 (2009).

*Evidence of Unfitness and Foreseeability*

In concluding that the father was unfit, the district court relied on the following statutory factors: (1) the father's emotional or mental illness was of such duration or nature as to render him unable to care for the ongoing physical, mental and emotional needs of the children, K.S.A. 2019 Supp. 38-2269(b)(1); (2) the father's suspected use of narcotic or dangerous drugs was of such duration or nature as to render him unable to care for the ongoing physical, mental or emotional needs of the children, K.S.A. 2019 Supp. 38-2269(b)(3); (3) reasonable efforts by the social service agencies had failed to rehabilitate the family, K.S.A. 2019 Supp. 38-2269(b)(7); (4) the father failed to adjust his circumstances, conduct or conditions to meet the needs of the children, K.S.A. 2019 Supp. 38-2269(b)(8); and (5) the father failed to carry out a reasonable plan approved by the court directed toward the reintegration of the children, K.S.A. 2019 Supp. 38-2269(c)(3). In addition, the district court also applied two statutory presumptions of unfitness, which will be discussed in the next section of this opinion.

When the sufficiency of the evidence supporting a decision regarding the termination of parental rights is challenged, we are to uphold the district court's determination if—after reviewing the record in a light most favorable to the prevailing party—we find that the factual findings are supported by clear and convincing evidence. In other words, we review the record to determine if a rational fact-finder could have found it highly probable that the circumstances support the termination of parental rights. In evaluating the evidence, we do not weigh conflicting evidence, pass on the credibility of witnesses, or determine factual questions. *In the Matter of the Adoption of B.B.M.*, 290 Kan. 236, 244, 224 P.3d 1168 (2010); *In the Interest of M.H.*, 50 Kan. App. 2d 1162, 1170, 337 P.3d 711 (2014).

17

A review of the record in this case reveals substantial evidence that the father suffered from emotional or mental illness. In particular, Dr. Dirks diagnosed him to have both antisocial personality disorder and intermittent explosive disorder. The diagnosis of antisocial personality disorder was based on the father's repeated behavioral problems that resulted in a series of arrests during the pendency of this case. Moreover, Dr. Dirks found that the father displayed a lack of remorse and instead blamed others for his circumstances.

Dr. Dirks testified that antisocial personality disorder is a permanent condition. She also testified that the characteristic of refusing to take responsibility renders therapy ineffective. Similarly, the diagnosis of intermittent explosive disorder was based upon the father's history of impulsive attacks on others as well as the anger he displayed toward social workers attempting to work with the family. As reflected above, the father exhibited behavior that supported these diagnoses throughout this case.

The father frequently exhibited aggression when he believed those working with the family failed to address his needs in the manner he desired. This behavior continued when he was residing in Michigan and was reflected in the vitriolic comments that he posted on social media about KVC and DCF, who he blamed for illegally taking his children. A short time after returning to Kansas, the father was arrested after engaging in an altercation with the mother. Thus, we find nothing in the record to lead us to the conclusion that Dr. Dirk's diagnosis of the father's emotional or mental condition was misplaced.

Even when the father was not angry or confrontational, he often exhibited other behavior consistent with antisocial personality disorder. In particular, a review of the record shows that he had a pattern of blaming others for his problems. In a November 2015 report to the district court, a CASA noted that "he seems unable to acknowledge or take responsibility for his part in creating the current situation and instead, tends to blame

18

others (such as caseworkers or the court system) and thus does not follow through on his court-ordered tasks." Even when testifying at trial, the father never acknowledged the role he played in having the children removed from the home.

Fortunately, there is nothing in the record to show that the father ever turned his aggression towards the children. However, there is evidence that on several occasions the father displayed anger or aggression while the children were in the home. Furthermore, Dr. Dirks opined that even if anger is directed at other adults, witnessing such behavior poses a risk of emotional abuse and could result in accidental physical injury to the children. Dr. Dirks also clarified that even when the children were in a different room or seemingly absorbed in another activity, it does not mean that they are oblivious to the violence surrounding them.

According to Dr. Dirks, antisocial personality disorder typically manifests itself in interactions with persons who challenge one's authority. Because children naturally challenge parental authority as they grow older, Dr. Dirks testified that such challenges could potentially trigger violence by the father toward T.W. and J.W. in the future. However, even if the father's anger were never directed at the children, Dr. Dirks and Monica Luedtke—a former caseworker for KVC who worked with the father—both testified that his behavior raised questions about his ability to interact successfully with others. This included those such as teachers, school administrators, or doctors who might offer opinions about the welfare of the children that differed from the father's opinion.

Dr. Dirks testified that the father would need to demonstrate long-term and consistent control of his emotions before reintegration with the children would be advisable. She also opined that even attendance at a Batterer's Intervention Program would not be enough because "[y]ou also have to demonstrate some insight into the situations that caused the violence and you have to be avoiding them." Based on our review of the record, we find clear and convincing evidence that the father neither

showed such insight nor was he able to avoid the type of aggressive behavior that so often led to his incarceration.

In determining whether the father's conduct or condition is likely to change in the foreseeable future, we must view this issue from the perspective of a child because children and adults have different perceptions of time. K.S.A. 2019 Supp. 38-2201(b)(4). A child is entitled to permanency within a time frame reasonable from his or her perspective. M.H., 50 Kan. App. 2d at 1170-71. Here, the record reflects that the children have been in out-of-home placements for a significant portion of their young lives. Unfortunately, the father's failure to complete the tasks assigned to him in the various case plans show that he was unable to adjust his behavior to meet the needs of his children. Accordingly, we conclude that there is sufficient evidence in the record to lead a reasonable person to believe it is highly probable that the father is unfit to support the physical, mental, and emotional well-being and that the condition was unlikely to change in the foreseeable future.

The father also challenges the district court's finding that the State expended reasonable efforts to reintegrate the children with their parents. In particular, he argues that the State—as well as the district court—actively sought to break the family apart. While the CASA and various social workers recommended the separation of the father and the mother, these recommendations were based on the repeated conflicts between the parents. As indicated above, these conflicts resulted in both parties being arrested on various occasions. Likewise, the recommendation to the mother that she discontinue contact with the father occurred at a point when the mother was making significant progress on completing the tasks assigned to her in the case while the father was at most making minimal progress on completing the tasks assigned to him.

The law requires only reasonable efforts to reintegrate families. *In the Interest of A.Z.*, No. 119,217, 2019 WL 638271, at *7 (Kan. App. 2019) (unpublished opinion); *In*

*the Interest of J.R.*, No. 104,975, 2011 WL 2175953, at *5 (Kan. App. 2011) (unpublished opinion). A reasonable case plan is designed to address the parental conduct or condition that caused the child or children to be removed from the care of the parent. *J.R.*, 2011 WL 2175953, at *5. Here, the record reveals that a substantial amount of time and effort was spent by KVC, DCF, and the district court attempting to find a way to help this family and to reintegrate the children with one or both parents. Although it is unfortunate that they were not successful, we cannot say that their efforts were unreasonable.

At best, the father's efforts in even attempting to complete the tasks assigned to him in the case plan were sporadic. As Luedtke testified at the termination hearing, "[t]here was a lot of times switching housing and in and out of jail, and . . . just those . . . changes in location or housing situation really made it difficult [for the father] to achieve a lot of case plan tasks and remain in steady contact with the agency and with the kids." Luedtke also testified that "as long as we are seeing progress and steady progress moving forward, I support working reintegration, but once we get to a point where things are going up and down and you are not seeing that stability in the progress moving forward, that's when we really need to look at changing the case plan goal."

Contrary to the father's contentions, the social service agencies involved in this case did not initially focus the case plan on reintegration solely with the mother. Rather, the focus of the case plan eventually moved in that direction based on the events that occurred as this case moved forward. The father's failure to perform the tasks required by the case plan—and the choices he made—ultimately led to the district court's decision to terminate his parental rights. Consequently, we conclude that the district court did not err in finding that reasonable efforts were made toward reintegrating the father and his children.

*Statutory Presumptions*

In finding the father to be an unfit parent, the district court also applied two statutory presumptions of unfitness under K.S.A. 2019 Supp. 38-2271. On appeal, the father contends that he received insufficient notice that these presumptions would be applied. He also contends that the district court failed to appropriately apply the presumptions and that he presented sufficient evidence to rebut the presumptions.

As the State contends, the father never objected to the district court's application of the statutory presumptions at the termination hearing. Generally, an issue not presented to the district court is not properly considered by an appellate court unless the litigant seeking judicial review of a newly raised issue explains why the issue should properly be considered as required by Kansas Supreme Court Rule 6.02(a)(5) (2020 Kan. Ct. R. 34). Our Supreme Court has required strict adherence to Rule 6.02 by litigants, and has held that a failure to provide an explanation as to why an appellate court should consider an issue for the first time on appeal precludes appellate review. See *State v. Godfrey*, 301 Kan. 1041, 1044, 350 P.3d 1068 (2015).

Here, the father has failed to point us to where in the record this issue was raised to the district court. Likewise, he has failed to explain why we should consider this issue for the first time on appeal. Even after the State raised the procedural issue in its brief, the father made no attempt to comply with Rule 6.02(a)(5). As such, we conclude that the issue regarding the application of the statutory presumptions is not properly before us on appeal.

*Best Interests of the Children*

As noted above, once a district court concludes that a parent is unfit, it must then consider whether termination of parental rights is in the best interests of the children with

primary weight being placed on the physical, mental, and emotional health of each child. K.S.A. 2019 Supp. 38-2269(g). Because a parent's fundamental right to a relationship with the children is no longer a consideration at this stage in the proceedings, the burden of proof regarding a child's best interests is merely preponderance of the evidence. K.S.A. 2019 Supp. 38-2269(g)(1); *Santosky v. Kramer*, 455 U.S. 745, 760, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). Further, at this dispositional stage, the district court is given broad discretion. See *In re R.S.*, 50 Kan. App. 2d at 1105, 1115-16, 336 P.3d 903 (2014). Thus, we review the district court's determination regarding the best interests of the children under an abuse of judicial discretion standard. *State ex rel. Secretary of DCF v. Smith*, 306 Kan. 40, 60, 392 P.3d 68 (2017).

Here, we find that there was substantial testimony presented at the termination hearing that—if believed—supported the district court's conclusion regarding the best interests of T.W. and J.W. In particular, testimony was provided by the children's foster mother as well as by their current caseworker. They testified about the children's behavioral issues, their development after being removed from the home, and the need for stability and permanency.

At the time of the termination hearing, the children had not had contact with the father for over a year and had been in foster care for a significant portion of their lives. In addition, the testimony presented was sufficient to establish that the children had no significant emotional bond with their father. Given the findings that that the father is an unfit parent and that the condition is likely to continue into the foreseeable future, we do not find that the district court abused its discretion in concluding that termination of the father's parental rights was in the best interests of T.W. and J.W.

*Indian Child Welfare Act*

Finally, the father contends that the district court violated the provisions of the Indian Child Welfare Act (ICWA). The ICWA requires that upon the filing of a proper petition for transfer, proceedings to terminate the parental rights of an "Indian child" who does not live on a reservation must be transferred to the appropriate tribal court. 25 U.S.C. § 1911(b) (2016). However, availability of this right to transfer is contingent on the applicability of the ICWA to the proceeding sought to be transferred." Furthermore, the party seeking to invoke the ICWA "has the burden to show that the act applies in the proceeding." *In re S.L.H.S.,* 885 N.E.2d 603, 612 (Ind. Ct. App. 2008)(citing J.L.M., 234 Neb. 381, 451 N.W.2d 377, 387 [1990]); see *Matter of S.K.*, 138 N.E.3d 329, 334 (Ind. Ct. App. 2019); *In re L.R.D.*, 128 N.E.3d 926, 930-31 (Ohio 2019).

The term "Indian child" is defined in 25 U.S.C. § 1903(4) as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C.A. 1903(4). The State appropriately provided the required notice to the tribes alleged by the father. 25 U.S.C. § 1912(a) (2016); *In re D.H.*, 54 Kan. App. 2d 486, 501, 401 P.3d 163 (2017). The district court thereafter found ICWA did not apply. Here, we find nothing in the record to suggest that either T.W. or J.W. are members of an Indian tribe. Likewise, we find nothing in the record to suggest that either child is a biological child of a member of an Indian tribe—either through their mother or their father.

At most, the father has established a possibility that the children may have "a large amount of Native American blood. . . ." However, to meet his burden of proof that the ICWA applies to this case, the father must do more than raise the possibility that the children may have Native American ancestry. See *In re B.S.*,184 Ohio App.3d 463, 921 N.E.2d 320 (2009). Simply having Native American ancestry—in and of itself—is not

24

sufficient to meet the definition of an "Indian child" for purposes of ICWA. The ultimate determination of whether a child is a member of or eligible for membership of a recognized tribe is solely determined by tribal or federal law. See 25 C.F.R. § 23.108 (2019); *Geouge v. Traylor*, 68 Va.App. 343, 361-62, 808 S.E.2d 541 (2017). Based upon our review of the record, we conclude that the district court did not err in its decision not to apply ICWA in this case.

Affirmed.